# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:20-MJ-02928 |
| | ) | |
| 1163 E. 223rd St., Carson, CA 90745 | ) ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | See attached Affidavit. |
| 18 U.S.C. §§ 1956(h), 2 | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Norman Abrams, Task Force Officer, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Edward Han, 213-894-8230

## ATTACHMENT A

PREMISES TO BE SEARCHED

Los Angeles County Property AIN #7332-011-027, which is associated with 1163 E. 223rd St., Carson, California 90745 (which also carries the address of 1163 E. 223rd St. 2, Carson California 90745) and consists of a residence/condo, and vehicles.

E. 223rd St. runs east-west.  The SUBJECT PREMISES is located in the gated community, Stonegate, on the Northwest corner of E. 223rd St. and Lucerne St.  The SUBJECT PREMISES is located in the southwest building of the complex.  The SUBJECT PREMISES is on the south of the building closest the pool and clubhouse.  The front door to the location is located on the south side of the building and faces south.  The numbers 1163 are mounted on the SUBJECT PREMISES on the southeast wall in white lettering on a brown placard next to the garage.

The search is to include ANY AND ALL locked or closed outbuildings, grounds, garages, sheds, carports, storage facilities, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans, and any other locked or closed hiding places located at and allotted to Abdi Aziz Mohamed.

The search is to include ANY AND ALL vehicles owned or under the control of Medi Kebir and Adil Yusuf at the time of

i

the search warrants.

The search is to include the above-described areas, as well as any vehicles parked at the property near or associated with the Cathinone ("Khat") distribution operation.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. § 2 (aiding and abetting); and 18 U.S.C. § 1956(h) and 2 (conspiracy to commit money laundering and aiding and abetting),(the "SUBJECT OFFENSES"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages

i

over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   e. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   f. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   g. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.     Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.     Contents of any calendar or date book;

k.     Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

l.     Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

m.     With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

iii

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

iv

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.   **All items to be seized will be transported to the District in which the case is filed.**

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

5.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s)

thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

       h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

       a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

       b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

       c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

       d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

       e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

       f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress KEBIR's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of KEBIR's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device

has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

10.  **All items to be seized will be transported to the District in which the case is filed.**

## AFFIDAVIT

I, Norman Abrams III, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is also made in support of an application for a warrant to search 1163 E. 223rd St., Carson, CA 90745 (the "SUBJECT PREMISES") as described more fully in Attachment A.

2.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. § 1956(h) (conspiracy to commit money laundering); and 18 U.S.C. § 2 (aiding and abetting) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Task Force Officer ("TFO") of the United States
Department of Justice, Drug Enforcement Administration ("DEA").
I am a federal law enforcement officer within the meaning of the
Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a
government agent engaged in enforcing the criminal laws and duly
authorized by the Attorney General to request a search warrant.
I have been a TFO with the DEA since November 2018 and have been
a commissioned peace officer with the Fort Worth Police
Department since July 2009.  I have been assigned to DEA's
Dallas Field Division, HIDTA office.  As part of my training, I
received training in the area of narcotics investigations at the
city of Fort Worth as well as the DEA Narcotics Investigators
training.  As part of my training, I learned to identify various
controlled substances, including Khat, a plant containing
cathinone.

5.    During my law enforcement career, I have received
training in all the normal methods of investigation, including,
but not limited to, electronic and visual surveillance, general
questioning of witnesses, confidential informants, pen
registers, the use of mobile tracking devices, the use of
cellular telephone Global Positioning Satellite (GPS)
information to locate individuals, the use of undercover agents,
and the use and execution of search warrants.  During my law
enforcement experience, I have conducted and participated in
investigations involving violations of the drug laws of the
United States, including violations of 21 U.S.C. §§ 841(a)(1)

and 846.  I have investigated numerous individuals who have derived substantial income from the importation, manufacture, distribution, and sale of illegal controlled substances.  I have experience in electronic and visual surveillance; general questioning of witnesses and confidential informants; pen registers as well as the use of mobile tracking devices; the use of cellular telephone GPS information to locate individuals; the use of undercover agents; and the use and execution of search warrants.  These investigations have resulted in the arrests and convictions of individuals who have used communications facilities to facilitate drug trafficking activity, and the seizures of illegal drugs and proceeds derived from drug trafficking activity.

6.  I am the secondary case agent on this case and I have assisted other agents and officers in investigations on cases involving violations of Title 21, United States Code, Section 841(a)(1), the manufacturing, distributing, and possession with intent to distribute controlled substances; and Title 21, United States Code, Section 846, conspiracy to commit the foregoing.  Specifically, those investigations have focused on the manufacturing and distribution of marijuana, methamphetamine, heroin, cocaine, and other controlled substances.  Through my training and experience, I have become acquainted with the identification of various controlled substances, including Khat, a plant containing cathinone that is a Schedule I controlled substance.  I have also become acquainted with the various

methods used by individuals to possess, transport, and sell controlled substances in violation of federal law.

7.   As a result of my training and experience, I have had the opportunity to converse with numerous law enforcement officers and drug enforcement officers, informants, admitted and known drug traffickers, including outdoor growers/traffickers, regarding the methods, manufacturing, importation, transportation, distribution, and sales of controlled substances.

8.   Specifically, based on my training and experience, through discussions with experienced narcotics investigators, and through the information I have learned through investigations, I know that Khat is a plant native to the horn of Africa and contains cathinone, a Scheduled I controlled substance.  I know that Khat is smuggled into the United States via freight shipment.  Due to the methods of importation, international smuggling operations utilize several ports of entry, as well as multiple locations throughout the United States, as secondary locations to store large shipments prior to being broken down into smaller shipments to be sent throughout the U.S. and abroad.  These methods leave a trail of evidence at multiple sources and are often held at residences and or place of businesses.  Such evidence includes:

        a.   Cathinone or Khat, in any form (growing, dried, processed, etc.);

        b.   Paraphernalia for packaging, processing, cutting, weighing, plastic bags, and heat sealing devices;

c.   Books, records, receipts, notes, ledgers, shipping receipts, air way bills/shipping manifests and other papers relating to the manufacture, distribution, and possession with the intent to distribute Cathinone or Khat;

d.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacturing, distribution, and possession with intent to distribute Cathinone or Khat and personal property tending to show the existence and/or location of any other controlled substance, including storage locker receipts, maps, safety deposit box keys and corresponding records;

e.   Cash or currency in excess of $2,000.00, and records relating to controlled substances incomes and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers;

f.   Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

g.   Firearms, ammunition, silencers, and other dangerous weapons;

h.   Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled substances;

i.   Items of personal property that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subjects premises, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills; statements, identification documents, and keys;

j.   Devices used to communicate with other individuals involved in the manufacturing, distribution, and possession with the intent to distribute Cathinone or Khat or any other controlled substance, including cell phones, mobile phones, tablets, computers, phone answering machines, answering machine tapes, beepers or pagers, devices to use counter-surveillance against law enforcement, such as police scanners, police radios, surveillance cameras, and monitors, anti-bugging devices, and recording devices or transmitters, and/or receipts or literature describing the same; and

k.   Assigned phone numbers for any and all phones, cell phones, and pagers found on the premises or vehicles, along with telephone toll records, papers, notebooks, and other items, documenting the manufacturing, distribution, or possession with intent to distribute Cathinone or Khat or any other controlled substance, and communications among co-conspirators.

9.   Based on my training and experience, I know that records are often maintained by drug traffickers.  Further, drug traffickers in many instances will, out of necessity, perform record keeping.  This allows them to keep track of amounts paid

and owed, and such records will be maintained close at hand so as to readily ascertain current balances for money owed/paid.

10.   It is also a common practice for traffickers to conceal large sums of money at their residences, either the proceeds from their drug sales/monies to be used to purchase controlled substances or items associated with the production of controlled substances.   In this connection, drug traffickers use wire transfers, cashier's checks, money orders, and cash to pay for their controlled substances.   Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

11.   Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the drug traffickers profits and/or supply of drugs.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

12.   This investigation involves a longstanding (dating back to 2007) and ongoing international drug trafficking organization ("DTO") involved in Cathinone or Khat smuggling and money laundering.

13.   Three indicted suspects share ties to the SUBJECT PREMISES.   Adil M. Yusuf ("YUSUF"), currently in custody, and his wife, Medi A. Kebir ("KEBIR"), live at the SUBJECT PREMISES as their primary residence, and use it as the registered address for their business in the state of California.   The third indicted suspect, Dawit M. Belete ("BELETE"), is also a

7

registered member/manager of the business being operated out of the SUBJECT PREMISES.  YUSUF and KEBIR also register this address with their joint personal accounts, as well as business accounts suspected of being used for money laundering transactions.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

15.  After a controlled delivery of approximately 380 kilograms of Cathinone (Khat), conducted by the DFW Airport Group in the Eastern District of Texas in April 2019, a large, complex, and ongoing international drug trafficking and money laundering organization was discovered.  One part of this organization was discovered to be under the operation and control of Abdulhakim Mohamed ("MOHAMED").  Further investigation identified several co-conspirators, including YUSUF, KEBIR, and BELETE.  MOHAMED was indicted in the Eastern District of Texas in October 2019 for violation of 21 U.S.C. § 841(a)(1), possession with the intent to distribute and distribution of Cathinone, a Schedule I controlled substance.  A continued investigation showed a close relationship between MOHAMED and YUSUF, as well as BELETE dating back a few years. The investigation also revealed that the three were involved in a shuttle bus industry in the Los Angeles area.  Upon further investigation, YUSUF was indicted in the Eastern District of Texas in November 2019 for violation of 21 U.S.C. § 841(a)(1),

8

possession with the intent to distribute and distribution of
Cathinone, a Schedule I controlled substance.

16.   In June 2020, a superseding indictment for MOHAMED,
YUSUF, KEBIR, and BELETE, along with other co-conspirators, was
obtained.  The superseding indictment was for violations of: 21
U.S.C. § 846(conspiracy to possess with the intent to distribute
and distribution of Cathinone) and 18 U.S.C. § 2 (aiding and
abetting) and 18 U.S.C. § 1956(h) and 2 (conspiracy to commit
money laundering and aiding and abetting).

### A.   Investigation of the SUBJECT PREMISES

17.   Based on a search of records from the California
Department of Motor Vehicles, I learned that YUSUF and his wife
KEBIR reported the SUBJECT PREMISES as their residence.  I also
learned that both YUSUF and KEBIR have a car registered to each
of them at the SUBJECT PREMISES.

18.   Business registration records in the State of
California showed that on or about July 24, 2019, BELETE, YUSUF,
and KEBIR were all listed as members on the California
registration of Aladdin Transportation LLC.  Aladdin
Transportation LLC listed its registered address as the SUBJECT
PREMISES.  A further review of the registration showed that the
manager of Aladdin Transportation LLC was YUSUF.  Several other
members on the registration document also listed the SUBJECT
PREMISES as their home address.  BELETE listed his registered
address on the form as 3790 Wisconsin St. #18, Los Angeles, CA
90066.

19.  A renewed registration dated March 12, 2020 --
submitted after the arrest of YUSUF -- showed YUSUF had been
moved from the position of manager to the list of members.  In
YUSUF's place, BELETE was now listed under the section for
manager(s).  Aladdin Transportation LCC still continued to use
the SUBJECT PREMISES as the registered address for the business.
The SUBJECT PREMISES is used as Aladdin Transportation LLC's
Street Address of Principle Office, Mailing address of LLC, and
Street Address of California Office.  KEBIR is listed as the
accountant on the 2020 California registration.  Aladdin
Transportation LLC is believed to be one of the companies
utilized to hide the source of drug proceeds, as well as to
legitimize wires and transfers of drug proceeds out of the
United States.

20.  On June 17, 2020, United States Customs and Border
Protection ("CBP") Special Response Team ("SRT") proceeded to
the SUBJECT PREMISES.  Upon establishing surveillance, they
observed a Ford sedan, California license plate 8DEB317, parked
at the location.  The vehicle was registered to YUSUF, currently
in custody in the Eastern District of Texas.  The surveillance
team also observed a Toyota Highlander, California license plate
MYINAYA, registered to Abdulahi Kebir, a.k.a. KEBIR.  While
conducting surveillance, CBP SRT observed two females exit the
residence.  One female matched the appearance and physical
description of KEBIR.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

21. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to

11

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

    h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

    22.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

    [1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

14

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

15

which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KEBIR's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of KEBIR's face with his or her eyes open to activate the facial-, iris-, and/or

16

retina-recognition feature.  I know, based on my training and experience, that, in order to protect valuable drugs and drug proceeds at a stash house, drug traffickers do not permit those who are uninvolved in the gang's drug business to be at the stash house.  In my training and experience, digital devices found in stash houses like the SUBJECT PREMISES may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because drug traffickers share digital devices on which to coordinate drug trafficking and the laundering of drug trafficking proceeds.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### VII. CONCLUSION

25.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A

_____

Norman G. Abrams III, Task
Force Officer, Drug
Enforcement Administration

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2020.

_____

UNITED STATES MAGISTRATE JUDGE

18